McMAHON v. HARDIN ET AL.

(April 1, 1929. Opinion and Decree.)

Howell Carter, Jr., and F. B. Freeland, of New Orleans, attorneys for plaintiff, appellant.

Merrick, Schwarz, Guste, Barnett and Redmann, of New Orleans, attorneys for defendant, appellee, Mrs. L. M. Valiente.

Geo. J. Untereiner, of New Orleans, attorney for defendant, appellee, Dr. Jos. A. Hardin.

WESTERFIELD, J. This is a suit by a private detective on a quantum meruit for the alleged value of his services, which he places at $2,000.00. The defendants, Joseph A. Hardin and Mrs. Louise Valiente, were formerly man and wife, having been separated by a decree of divorce based upon the adultery of the husband. The plaintiff was employed by the wife for the purpose of procuring evidence of the husband's adultery. His efforts at first being unsuccessful, the wife filed suit for a separation upon the ground of cruel treatment on February 15, 1923. This suit, however, was abandoned and the parties resumed marital relations. The reconciliation did not prove permanent, and on November 23, 1925, Mrs. Hardin brought another suit against her husband, this time for divorce, upon the ground of adultery, plaintiff having in the meantime secured satisfactory evidence of the husband's guilt, upon which evidence a decree dissolving the marriage was based.

A separation of the community of acquets and gains followed.

The husband and wife were sued jointly. The wife is alleged to be liable for the compensation claimed by plaintiff upon the ground that she engaged his services, and the husband, because he was the head and master of the community formerly existing between himself and his divorced wife, and, as such, responsible for necessary expenses incurred by the wife in obtaining a legal separation and divorce.

A number of defense are presented, some of which pertain only to Dr. Hardin and some only to his wife. The one which we will first consider is available to both defendants, since it involves the character of the contract, as being contra bonos mores.

The record shows that the plaintiff was employed to get evidence of the husband's infidelity. His only hope of compensation lay in the dissolution of the marriage and the division of the community property, since, as the record plainly shows, he knew the wife was possessed of no paraphernal funds. His testimony exhibits great impatience with the wife's conduct in delaying divorce proceedings, after he had obtained what he regarded as sufficient evidence of the husband's adultery, which, he testifies, she often condoned. In other words, plaintiff's compensation was contingent upon his procuring evidence to establish the husband's misconduct and upon the continued determination of the wife to make use of such evidence, for the purpose of dissolving the marriage. The legal question, therefore, is whether a contract of this kind is enforceable and not repugnant to public policy.

It has been held that attorney's fees in separation and divorce suits are recoverable against the community. Purser & Magruder vs. Baientolila, 152 La. 716, 94 So. 366, 25 A. L. R. 348; Gosserand vs. Monteleone, 159 La. 316, 105 So. 356, 42 A. L. R. 310; Id. 164 La. 397, 113 So. 889; Lester vs. Lester, 160 La. 708, 107 So. 499.

It is said that the analogy between attorney's fees and detective fees is very close, since both are essential to the exercise of the right conferred by law to obtain legal separation under certain conditions.

We do not think so and can find no similarity in a contract for legal services and one for the procuring of testimony to establish certain facts essential to the dissolution of the marriage.

"Contracts so framed as to have effect only on condition that a divorce between the parties should be granted are held illegal, as their object is to interest the party to be benefited in procuring or permitting a divorce. * * *

"The fact that such a contract is supported by other and valid consideration will not relieve it of illegality.

"An agreement between attorney and client as to compensation is not illegal, although contemplating a proceeding to secure a divorce, unless it involves the personal interest of the attorney in preventing a reconciliation between the parties, as where it is contingent on success, or is measured by the amount of alimony secured." 13 Corpus Juris, page 464.

"If the object of a contract is to divorce man and wife the agreement is against public policy and void. The reason of the repugnance with which the law views all contracts with the purpose of dissolving the marriage relation may be found in its regard to virtue, the good order of society, the welfare of the children as the fruit of the marriage, and the sacred character of the conjugal relation. * * *." 13 Corpus Juris, page 463.

Contracts in restraint or derogation of the marriage relation are against public policy and void. So, also, is an agreement not to marry; a contract to bring about a marriage; a contract to hasten an intended marriage; a contract between a husband and wife contemplating a future separation; an agreement by which a wife undertakes to pay her attorney, in a suit for divorce and alimony, a certain percentage of whatever property may be awarded her out of her husband's estate. (See Elliott on Contracts, volume 2, section 753 et seq.)

In Hall vs. Cartwright, 18 La. Ann. 414, it was held that "public policy, good morals and the highest interest of society require, that the marriage relation should be surrounded with every safeguard, and their severance allowed only for the causes specified by the law, and clearly proven." See, also, Barringer vs. Dauernheim, 127 La. 679, 53 So. 923.

In the Succession of Elliot, 28 La. Ann. 183, it was held that an item of $500.00, charged by Elliot's attorney for having, among other services rendered, " 'entered upon the business of securing evidence' for a contemplated suit for separation between Elliot and his wife, which was never brought, cannot be regarded as legitimate. An attorney ought not to recover on such a demand."

In Ruling Case Law, volume 6, section 164, page 757, it is said:

"It is not unlawful to make a contract to procure such evidence as may exist, as for instance to employ persons to search for material witnesses or for important documents which may have been lost. But it is otherwise as to contracts to procure evidence or witnesses to prove a particular point or issue or such as enable a person to win or settle a suit. Contracts to pay for collecting or procuring testimony to be used in evidence, coupled with the condition that the contractee's right to compensation depends on the character of the testimony procured or upon the result of the suit in which it is to be used, have been universally condemned by the courts as contrary to public policy, for the reason that such agreements hold out an inducement to commit fraud or procure persons to commit perjury."

In a very late case, Weil vs. Neary, decided January 2, 1929, reported in the U. S. Supreme Court Advance Opinions of January 15, 1929, page 171, the Supreme Court denounced a contract for the division of fees between counsel for creditors of a bankrupt and counsel for the trustees upon the ground that such contracts were opposed to public policy, saying:

"The chief argument that is pressed upon us to declare the contract valid and to sustain the judgment based upon it is the success with which the plaintiff is found to have worked out a useful settlement of the estate for the benefit of the creditors, and the absence of any finding or showing that there was actual fraud. But this is not a sufficient answer to the charge of illegality. The contract is contrary to public policy—plainly so. What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases. Even if the ultimate results in the management of the Thompson estate were good, that could be no excuse for a contract plainly illegal, because tending to produce the recognized abuses which follow fraud and disloyalty by agents and trustees. Enforcement of such contracts, when actual evil does not follow, would destroy the safeguards of the law and lessen the prevention of abuses. Providence Tool Co. vs. Norris, 2 Wall. 45, 17 L. Ed. 868; Woodstock Iron Co. vs. Richmond Extension Co., 129 U. S. 643, 9 S. Ct. 402, 32 L. Ed. 819; Oscanyan vs. Winchester Arms Co., 103 U. S. 261, 26 L. Ed. 539; Meguire vs. Corwine, 101 U. S. 108, 25 L. Ed. 899; Connors vs. Connolly, 86 Conn. 641, 86 A. 600, 45 L. R. A. (N. S.) 564;

Richardson vs. Crandall, 48 N. Y. 348; Palmbaum vs. Magusky, 218 Mass. 306, 308, 104 N. E. 746 (Ann. Cas. 1915D, 799)."

The law looks with kindly eye upon the ancient and honorable institution of matrimony. It regards with benevolent satisfaction the esteem in which the marriage relation is held by its fellow-servant, religion, though it does not subscribe to the concept dear to every religious heart concerning the celestial origin of the contract of marriage. It would encourage, without precipitation, individuals eager to assume conjugal relations; it would direct, momentarily at least, the attention of the high contracting parties prone to view only the beatitudes of marriage, to a contemplation of its responsibilities. It would emphasize the fact that the contract of marriage is commutative, not aleatory. However, when the contract has been entered into, it is dignified as a status, which is intended to be permanent, as human institutions go, and no undertaking by third persons to destroy that status will be countenanced.

We believe the contract to be unenforceable as against public policy.

It is unnecessary to consider the other defenses which have been offered.

For the reasons assigned the judgment appealed from is affirmed.